**Affirmed and Memorandum Opinion filed March 5, 2019.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-17-00411-CR

_____

### ROBERT DEWAYNE BOLDEN, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 185th District Court
Harris County, Texas
Trial Court Cause No. 1487229**

## M E M O R A N D U M   O P I N I O N

Appellant Robert Dwayne Bolden appeals his conviction for murder. A jury found appellant guilty and assessed his punishment at 99 years in prison. In four issues, appellant challenges the sufficiency of the evidence to support his conviction and asserts that the trial court erred in denying his motion to suppress his custodial statement and his motion for a mistrial based on a witness's referencing an extraneous offense and in overruling his objection to the admission

of video footage from a security camera. We affirm.

## *Background*

On August 25, 2015, complainant Brianna Hudson was found in her apartment having been beaten to death with a blunt instrument. Appellant had been in a relationship with Brianna's sister, Sherry Hudson. Sherry testified that she moved out of appellant's apartment in early August 2015 after she and appellant had an argument and he choked her. Sherry then moved in with Brianna and another sister, Shalecia Mitchell. Appellant would occasionally come by the sisters' apartment to see Sherry and so that Sherry could see their infant son, who was living with appellant. Sherry described appellant's conduct toward her as "abusive" and "controlling." Sherry further explained that appellant had a negative attitude toward Brianna and had previously made threats against her and other members of their family. Shalecia also testified that appellant blamed Brianna for his separation from Sherry.

Sherry stated that on August 24, 2015, she called the police after appellant punched and threatened to kill her. Shalecia then took Sherry to appellant's apartment to meet with the police so that Sherry could retrieve some of her belongings. At one point, according to Shalecia, appellant called her and said that he "would F [her] and [her] family up." Meanwhile, Brianna spent that night with her boyfriend. The next morning, Shalecia drove Sherry to meet with an attorney to pursue custody of the child and a protective order against appellant. Around 12:30 p.m., while they were at the attorney's office, Brianna came and got a key to the apartment from Shalecia. When Sherry and Shalecia returned to their apartment around 1:50 p.m., they discovered the front door was unlocked and there was blood on the floor. Shalecia followed the trail of blood to a bedroom closet and there discovered Brianna. Shalecia then called 911, and Brianna was subsequently

2

pronounced dead at the scene. Responding sheriff's deputies reported significant amounts of blood in the area of the closet. They additionally noted that the apartment's front door showed signs of a forced entry, but Shalecia testified that the only items missing were Sherry's and Brianna's cell phones and Brianna's car keys. However, Brianna's car was still in the apartment complex's parking lot.

The forensic pathologist who conducted an autopsy on Brianna testified that she suffered multiple blunt-force injuries to her head that resulted in her death. He further explained that Brianna had been struck at least 18 times with an unknown implement.

A crime scene investigator testified that four fingerprints were lifted from the apartment. One, from a bedroom doorjamb, was determined to be appellant's, two were determined to match a female friend of the sisters, and the fourth could not be identified. DNA swabs were also taken from the scene, Brianna's clothing and body, and appellant's car. Appellant was excluded as a contributor to the samples obtained at the scene and from Brianna, and Brianna's DNA was not found in appellant's car.

An analysis of cell phone data based on the location of cell towers contacted by appellant's cell phone demonstrated that his phone was in the area of the sisters' apartment around the time that Brianna was killed. Additionally, shortly after the established time of the murder, both appellant's phone and Brianna's phone were shown to have travelled in the direction of appellant's apartment. However, Brianna's phone appears to have remained near a Circle K convenience store where appellant acknowledged stopping, while appellant's phone continued to the area of his apartment.

The State additionally introduced video recordings taken on the day of the murder by security cameras at three different locations: a Valero gas station, a

3

CubeSmart self-storage facility, and the Circle K convenience store. The videos were played to the jury while Deputy Mario Quintanilla provided narration. The Valero and CubeSmart videos showed a bright green car, which Quintanilla identified as appellant's vehicle, pass by those locations. The timestamp on the Valero video showed that the vehicle passed that location at approximately 12:40 p.m.; however, Deputy Dustin Tunello, who retrieved the video, testified that he determined the timestamp was off by about an hour and the car actually passed that location at approximately 1:40 p.m. The timestamp on the CubeSmart video showed that the vehicle passed that location at 1:42. Quintanilla explained that the Valero and Cubesmart locations were on a possible route that appellant could have taken from the murder scene to his own apartment.

The Circle K video showed appellant pull into the parking lot and park at one of the gas pumps at approximately 2:35 p.m. Appellant exited his vehicle and opened his trunk. Shortly thereafter, a man walked into the parking lot and approached appellant. As Quintanilla explained, appellant then appeared to remove his shoes and put on another pair of shoes. The man who had approached appellant then walked away from the Circle K barefoot as appellant closed his trunk, got back into his car, and pulled to a different pump. Appellant then got back out of his car, reopened the trunk, and as Quintanilla described for the jury, appeared to throw something in a trash receptacle by the pump. Appellant then entered and exited the store and eventually drove away.

Christi Johnson testified that she lived in the same apartment complex as appellant and would sometimes babysit his child. She stated that she babysat the child overnight on the evening of August 24, 2015, and appellant retrieved the child from her between noon and 1 p.m. the next day. She acknowledged that she may have originally told the police and the prosecutor that appellant picked up the

4

child at 2:00 p.m., but she explained that after she thought about it some more, she realized it was earlier than that. She further testified that when appellant retrieved the child, she did not notice any blood on him or his clothes, any torn clothing, or any wounds on his face. She additionally said that he did not seem upset.

Mishikia Peacock testified that she was an acquaintance of appellant's who sometimes babysat his child. On August 25, 2015, appellant asked Peacock if she could babysit the child overnight because he was starting a new job. She agreed, and when appellant brought the child to her house, he acted nervous, "[l]ike something was going on," and was short with her. Peacock said that appellant stayed at her house for about five hours before leaving and spent the whole time pacing and going up and down the stairs, sometimes talking on the phone. Eventually, appellant left his bright green car at Peacock's house and drove away with the baby in a different vehicle. She did not notice any blood on his clothes or any bruises on his face.

A friend of appellant's, Paul Eddings, testified that on August 25, 2015, appellant asked to borrow Eddings' car. Appellant then drove the car to Fort Worth where his brother lived. Appellant was arrested in Fort Worth on August 26, and Quintanilla and another deputy travelled to Fort Worth and obtained an audiotaped statement from appellant. The audio—in which appellant denied killing Brianna but admitted that he was in the area around the time of her death—was played for the jury over appellant's motion to suppress.

### *Sufficiency of the Evidence*

In his first issue, appellant challenges the sufficiency of the evidence to support his conviction for murder. In assessing the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational

trier of fact could have found the challenged element or elements of the crime beyond a reasonable doubt. *See Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014); *see also Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). In reviewing historical facts that support conflicting inferences, we presume that the jury resolved any conflicts in the State's favor and defer to that resolution. *Whatley*, 445 S.W.3d at 166. We do not sit as a thirteenth juror and may not substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). As judge of the credibility of the witnesses, a jury may choose to believe all, some, or none of the testimony presented. *Cain v. State*, 958 S.W.2d 404, 407 n.5 (Tex. Crim. App. 1997).

Circumstantial evidence is as probative as direct evidence and can be sufficient on its own to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). "In circumstantial evidence cases, it is not necessary that every fact and circumstance 'point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances.'" *Temple v. State*, 390 S.W.3d 341, 359-60 (Tex. Crim. App. 2013) (quoting *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)).

Appellant was charged with murder under section 19.02(b) of the Texas Penal Code which provides that "[a] person commits an offense if he: (1) intentionally or knowingly causes the death of an individual; [or] (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code § 19.02(b). Appellant argues that the evidence was insufficient to prove that he caused Brianna's death. Specifically, appellant insists that the only evidence connecting him to the murder

6

was the analysis of cell phone records that showed his and Brianna's phones were in the same areas around and immediately after the time of death. Appellant further identifies certain evidence as valueless and notes certain holes in the State's case. For example, appellant emphasizes the fact that his DNA was not found at the crime scene or on Brianna and that Brianna's DNA was not found in his car. He suggests that the one fingerprint of his found at the crime scene could be explained by the fact that he sometimes went to the sisters' apartment to see Sherry. And he points out that he did not admit to the murder in his statement to police and that Christi Johnson provided an alibi for him for the time of the murder.[1] He additionally argues that Sherry's allegation that he abused her was not credible because she continued to see him after the alleged abuse and she did not have any visible injuries.

Although some of appellant's points were certainly worth consideration by the jury, he ignores substantial evidence pointing toward his guilt. To begin with, there was testimony indicating that appellant did not like Brianna and blamed her for his separation from Sherry and that he had previously threatened Brianna and other members of her family. Indeed, Shalecia testified that appellant threatened their family the day before the murder. As to appellant's argument that Sherry's abuse allegations were not credible because she continued to see him after the alleged abuse and because of the lack of visible injuries, we note that the jury is the sole judge of Sherry's credibility. *See Cain*, 958 S.W.2d at 407 n.5. The fact that the only property apparently taken from the apartment was Brianna's and Sherry's phones and Brianna's car key, but the car was left in the apartment complex's parking lot, suggests that the motive for the murder was not robbery. Although one

---

[1] As mentioned above, Johnson originally told deputies that appellant came to her house at 2:00 p.m., which would have been after the time of the murder, but she testified at trial that he came to her house at 1:00 p.m.

possible explanation for the presence of appellant's fingerprint at the scene is his relationship with Sherry, another explanation a reasonable jury could have found is that appellant was present in the apartment at the time of the murder. Moreover, the fact that appellant's phone and Brianna's phone appeared to move together shortly after the murder supports, at least, the conclusion that Brianna's phone was in appellant's possession after the murder. Likewise, the fact that Brianna's phone remained in the area of the Circle K after appellant stopped there and appeared to throw something away also suggests appellant was in possession of her phone after the murder.

The Circle K video additionally shows appellant appearing to change shoes into a pair that someone brought him, a particularly noteworthy occurrence given the amount of blood deputies reported at the murder scene. Moreover, the testimony from Peacock regarding appellant's behavior the evening after the murder and the fact appellant drove to Fort Worth in a borrowed car shortly after the murder are indicative of his guilt. *See Clay v. State*, 240 S.W.3d 895, 905 & n.11 (Tex. Crim. App. 2007) (explaining that evidence of flight evinces a consciousness of guilt); *Mendez v. State*, 56 S.W.3d 880, 894 (Tex. App.—Austin 2001, pet. ref'd) (identifying defendant's nervous behavior on the day of murder as part of the circumstantial evidence of guilt).

Considering all of the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that appellant murdered Brianna. *See Whatley*, 445 S.W.3d at 166. Accordingly, we overrule appellant's first issue.

### *Motion to Suppress*

In his second issue, appellant asserts that the trial court erred in denying his motion to suppress his custodial statement because he did not voluntarily waive his

8

rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), or article 38.22 of the Texas Code of Criminal Procedure. At the conclusion of the suppression hearing, the trial judge stated that she found that appellant's statement was freely and voluntarily given and that he voluntarily waived his rights.

We review a trial court's denial of a motion to suppress for an abuse of discretion. *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014). In conducting the review, we give almost total deference to a trial court's express or implied determination of historical facts and consider de novo the court's application of law to the facts. *Alford v. State*, 358 S.W.3d 647, 652 (Tex. Crim. App. 2012). We view the evidence in the light most favorable to the trial court's ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). The trial court is the sole trier of fact and judge of the credibility of witnesses and the weight to be given to their testimony. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). We will sustain the trial court's ruling if it is reasonably supported by the record and correct on any theory of law applicable to the case. *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003).

A defendant's statement may be admitted into evidence against him if it appears that he made the statement freely and voluntarily, without compulsion or persuasion. Tex. Code Crim. Proc. art. 38.21. Article 38.22 of the code, entitled "When statement may be used," establishes the procedural safeguards for securing the privilege against self-incrimination. *See Joseph v. State*, 309 S.W.3d 20, 23 (Tex. Crim. App. 2010). No oral statement of an accused made as a result of a custodial interrogation may be admitted against the accused in a criminal proceeding unless (1) the statement was recorded and (2) before the statement but during the recording, the accused was warned of his rights and knowingly, intelligently, and voluntarily waived those rights. *See Miranda*, 384 U.S. at 444–

9

45; *Joseph*, 309 S.W.3d at 23–24.

Article 38.22, section 2(a), requires the defendant be informed of the following rights:

(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at trial;

(2) any statement he makes may be used as evidence against him in court;

(3) he has the right to have a lawyer present to advise him prior to and during any questioning;

(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5) he has the right to terminate the interview at any time.

Tex. Code Crim. Proc. art. 38.22, § 2(a).

The State bears the burden of establishing by a preponderance of the evidence that a defendant knowingly, intelligently, and voluntarily waived his rights. *Joseph*, 309 S.W.3d at 24. It is not required that the recording of the accused's statement contain an express waiver of rights. *Rocha v. State*, 16 S.W.3d 1, 12 (Tex. Crim. App. 2000). A waiver of rights may be inferred from the actions and words of the person interrogated. *Joseph*, 309 S.W.3d at 25. In evaluating whether appellant knowingly, intelligently, and voluntarily waived his rights, we use a two-pronged test, in which we ask: (1) whether the relinquishment of the right was voluntary by determining whether it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and (2) whether the waiver was made with full awareness of the nature of the rights being abandoned and the consequences of the decision to abandon them. *Id*. We look to the totality of the circumstances in determining whether a statement was made voluntarily. *Id*.

As stated, appellant asserts that at no point did he waive his rights. To the contrary, appellant insists that he was coerced into giving a statement and possessed an inadequate level of comprehension regarding his rights and the consequences of waiving them.

At the hearing on the motion to suppress, Quintanilla testified that he started recording as soon as they entered the interview room and although introductions may have occurred before that, there was no off-the-record conversation regarding the investigation. Quintanilla further stated that no promises were made to appellant.

At the beginning of the recording, appellant told the deputies that he was planning to talk to them and had even told his neighbor in Houston that if the neighbor saw the police, the neighbor should get a card so that appellant could call. Quintanilla then told appellant that he needed to read him his rights and instructed appellant to say "yes" or "no" to indicate whether he understood each of the rights. Quintanilla then read appellant each of the rights listed in article 38.22, section 2(a) and asked appellant, after reading each one, whether he understood the particular right. After each, appellant responded "yes, sir." The deputies then explained why they wanted to talk to appellant, and a conversion followed regarding events before and after Brianna's murder. The interview lasted two hours and forty-nine minutes. Appellant appears eager in the recording to provide the deputies with his account; he does not hesitate and presents his version of events with only occasional questions and prompting by the deputies. Appellant does not identify any point during the interview in which the deputies made promises or coerced him into speaking. Moreover, at no point did appellant request an attorney or request that

the interview stop.[2]

Appellant was adequately advised of his rights and affirmatively indicated that he understood each of his rights. *See Joseph*, 309 S.W.3d at 27. Appellant attempts to distinguish *Joseph* because in that case, the defendant signed a card that contained the required warnings in addition to being read the warnings and affirmatively indicating he understood his rights. The court in *Joseph*, however, did not say that signing a warnings card was required to demonstrate understanding; it just mentioned both the defendant's saying he understood his rights (by stating "yes, sir" after each right was read, same as appellant in the present case) and the signing of the card as indicators that the defendant sufficiently understood his rights. The *Joseph* court further observed that the defendant's refusing to comment on certain matters during the course of the interview indicated his awareness of his rights. The same could be said of appellant's interview in the present case. Appellant declined to provide certain information to the deputies during the interview, he said because he did not want to involve other people in the investigation. Viewing the evidence in the light most favorable to the trial court's ruling, the record supports the trial court's conclusion that appellant was adequately aware of his rights and the consequences of waiving them. *See id*. at 25; *Wiede*, 214 S.W.3d at 24.

---

[2] On a few occasions during the interview, appellant declined to provide certain information to the deputies, including the names of a couple of people who appellant referenced in the discussion and the location of his car. At around the two-hour mark of the 2:49 long interview, appellant asked if the deputies could release his friend's car—the car that he borrowed to drive to Fort Worth—in exchange for appellant telling them where his car was and what he was doing on a particular date. One of the deputies makes a sound in response, but it is not clear on the recording what the response was. One of the deputies then says that they will release the car when they are done with it. Appellant then provides the information regarding where his car was located and what he was doing on the date in question. Appellant does not contend that this exchange—two hours into the interview—somehow rendered his statement or his waiver of rights involuntary.

As in *Joseph*, after indicating he understood his rights, appellant indicated eagerness to tell the deputies his account of events, and at no point did he request counsel or ask that the interview be stopped. 309 S.W.3d at 27. There is no indication of coercion or deception by the deputies in the recording. Accordingly, the totality of the circumstances demonstrate that appellant knowingly, intelligently, and voluntarily waived his rights and provided a statement. We overrule appellant's second issue.

### *Motion for a Mistrial*

In issue three, appellant contends that the trial court erred in refusing to declare a mistrial after Deputy Quintanilla referenced an extraneous offense in his testimony. The testimony in question came during the State's direct examination of Quintanilla:

Q. After interviewing [Shalecia] and [Sherry], did you have a person of interest?

A. Yes, ma'am.

Q. Who was that?

A. [Appellant].

Q. Okay. Did you have a possible motive?

A. Yes, ma'am.

Q. What was that?

A. Family violence.

Q. Okay. Were you able to confirm that there had, in fact, been prior family violence reports?

A. Yes, ma'am.

Q. Okay.

[Defense Counsel]: Object to that. Calls for hearsay, knowledge of hearsay.

THE COURT: Sustained.

13

[Defense Counsel]: We would like the jury to be instructed to disregard that.

THE COURT: The jury will disregard the last statement of the witness.

[Defense Counsel]: And we respectfully request a mistrial.

THE COURT: Denied.

We review a trial court's denial of a motion for mistrial for an abuse of discretion. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). We view the evidence in the light most favorable to the trial court's ruling and will uphold the ruling if it falls within the zone of reasonable disagreement. *Id*. A mistrial is an extreme remedy reserved for a narrow class of cases in which the error is highly prejudicial and incurable. *Id*. In determining whether a mistrial is warranted, we consider the prejudicial effect, any curative measures taken, and the certainty of conviction absent the prejudicial event. *Jackson v. State*, 495 S.W.3d 398, 421 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd).

Testimony that improperly refers to or implies extraneous offenses allegedly committed by a defendant may generally be cured by a prompt instruction from the trial court to disregard the testimony. *See Ladd v. State*, 3 S.W.3d 547, 571 (Tex. Crim. App. 1999). An exception to this general rule exists if the improper testimony is clearly calculated to inflame the minds of the jury and is of such character to suggest the impossibility of withdrawing the impression produced on the minds of the jury. *Jackson*, 495 S.W.3d at 421.

Appellant asserts here that Quintanilla's reference to "family violence" was highly prejudicial and incurable because it indicated that the prior family violence in question was against Brianna. Although appellant's argument is not explicit as to how he reaches this conclusion, he appears to be suggesting that because Quintanilla identified family violence as a possible motive for Brianna's murder,

14

the family violence in question must have been against Brianna. This conclusion, however, does not appear warranted for at least two reasons. To begin with, prior to Quintanilla's testimony, the jury had already heard Sherry testify that appellant was physically abusive to her. In fact, the day before the murder, Sherry reported to the police that appellant had punched her. In contrast, there was no evidence in the record of any prior violence toward Brianna.

Additionally, there was no evidence that appellant and Brianna would be considered "family" for purposes of an offense involving family violence; whereas, appellant could be considered family with Sherry as they were in a dating relationship at the time of the alleged assault and parents of the same child. *See* Tex. Penal Code §22.01(b)(2) (providing that the punishment range for an assault is enhanced when it is against someone in a particular type of relationship to the defendant, including a dating relationship and parents of the same child).

Viewing the evidence in the light most favorable to the trial court's ruling, *see Ocon*, 284 S.W.3d at 884, the most logical inference for the jury to have made would have been that the prior family violence reports mentioned once briefly during testimony pertained to Sherry, not Brianna. Therefore, appellant's basis for arguing that the reference to family violence was highly prejudicial and incurable is without support. Indeed, nothing in the record indicates that Quintanilla's reference to family violence was of such a character as to make it impossible to remove the harmful impression from the jurors' minds. The trial court promptly instructed the jury to disregard the comment, and we presume the jury followed the trial court's instruction. *See Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998); *Jackson*, 495 S.W.3d at 421. Accordingly, we overrule appellant's third issue.

### *Gas Station Video*

15

In his fourth issue, appellant contends that the trial court erred in refusing to exclude the video obtained from the Valero gas station. Appellant specifically insists that the State failed to properly authenticate the video because the time stamp on the video allegedly did not correspond to the actual time.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Tex. R. Evid. 901. In a jury trial, it is the jury that ultimately determines whether an item of evidence is what its proponent claims; the trial court need only make the preliminary determination that the proponent of the item has supplied facts sufficient to support a reasonable jury determination that the proffered evidence is authentic. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). The trial court's determination of whether the proponent has met this threshold requirement is subject to appellate review for an abuse of discretion and should not be reversed so long as it is within the zone of reasonable disagreement. *Id*. There is no abuse of discretion if the trial court "reasonably believes that a reasonable juror could find that the evidence has been authenticated or identified." *Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007).

Conclusive proof of authenticity before the admission of disputed evidence is not required. Rule 901 merely requires some evidence sufficient to support a finding that the evidence in question is what the proponent claims. *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018). Authenticity may be established with evidence of "distinctive characteristics and the like," which include "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Tex. R. Evid. 901(b)(4). Video recordings without audio are treated as photographs and are

16

properly authenticated when it can be proved that the images accurately represent the scene in question and are relevant to a disputed issue. *Fowler*, 544 S.W.3d at 849.

Deputy Tunello, who obtained the Valero video in question, testified that he is a technical investigator with the sheriff's office's homicide unit and that part of his regular duties is to obtain relevant surveillance footage when available. He described his standard procedure as follows: He first acquires location, date, and time information from the primary investigator. He then obtains permission from the property owner before reviewing video and, if he finds relevant footage, recovers the footage himself. He checks the recording for date and time accuracy and confirms that the recorded images accurately reflect the location being videoed. He downloads the video himself onto a flash drive and subsequently transfers it onto a disk. He checks before he leaves the location to make sure that he obtained the correct footage. He then confirms that he made a true and accurate copy.

Specifically regarding the Valero video, Tunello stated that the Valero manager provided him with access to their system. Tunello then checked the date and time accuracy of the system using an application on his cell phone and determined that the system was approximately one hour off, with the relevant footage showing a time of around 12:40 p.m. when the real time was approximately 1:40 p.m. He asserted that the recording accurately depicted the area being videoed. He further stated that he exported a fair and accurate copy of the video and that the video being offered into evidence was the same video that he had obtained and had not been altered in any way.

As stated, appellant's complaint regarding the Valero video is that the time was reportedly off by about an hour. Appellant asserts that this discrepancy means

that the video was not properly authenticated and thus was not admissible. Appellant, however, does not cite any authority to support his position that a one-hour time discrepancy by itself would defeat authentication. To the contrary, a number of Texas courts have held that similar or even greater discrepancies did not defeat authentication. *See, e.g., Dillard v. State*, No. 12-17-00019-CR, 2018 WL 1407090, at *6 (Tex. App.—Tyler Mar. 21, 2018, pet. ref'd) (mem. op., not designated for publication) (holding admission of video was within zone of reasonable disagreement even though date stamp was off by one day); *Saldana v. State*, No. 05-15-00059-CR, 2015 WL 6602073, at *3 (Tex. App.—Dallas Oct. 30, 2015, pet. ref'd) (mem. op., not designated for publication) (holding that video time stamp being off by "a few minutes" did not defeat authenticity); *Razo v. State*, No. 02-11-00161-CR, 2012 WL 3207271, at *7 (Tex. App.—Fort Worth Aug. 9, 2012, no pet.) (mem. op., not designated for publication) (holding video was properly authenticated where store employee testified the time was accurate except being off by one hour).

Tunello testified that the recorded images accurately depicted the location in question and were relevant to a disputed issue. *See Fowler*, 544 S.W.3d at 849. He further stated that the video being offered into evidence was an accurate copy of the surveillance video and had not been altered in any way. Under these circumstances, the trial court could have reasonably concluded that a reasonable juror could find that the evidence had been authenticated. *See Druery*, 225 S.W.3d at 502. Accordingly, we overrule appellant's fourth issue.

We affirm the trial court's judgment.

/s/ Frances Bourliot
Justice

Panel consists of Justices Wise, Jewell, and Bourliot.

Do not publish — TEX. R. APP. P. 47.2(b).